FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

99 APR 22 AM 9:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

|  |  |
|---|---|
| PATRICIA COUCH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CV 97-BU-2817-M |
| ) | ENTERED |
| CNA INSURANCE COMPANIES, ) | |
| ) | APR 2 2 1999 |
| Defendant. ) | |

Memorandum Opinion

This cause comes on to be heard on cross-motions for summary judgment, the first a motion for partial summary judgment filed by the plaintiff, Patricia Couch ("Couch"), on February 19, 1999, and the second a motion for summary judgment filed by the defendant Continental Casualty Company ("CNA"), on February 19, 1999. In her motion, Couch contends that no genuine issue of material fact exists contrary to her position that CNA is liable for long-term disability benefits under her employer's welfare benefit plan. In its motion, CNA contends that no genuine issue of material fact exists that long-term benefits under the plaintiff's policy were properly denied.

Summary judgment provides the parties an invaluable opportunity to test the mettle of a case before it ever reaches trial. On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary

judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment has the initial responsibility of informing this court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The movant's burden is not meager; it must illuminate, either through evidence on file or, where no such evidence can be presented, through affirmatively pointing out the reasons why the non-movant cannot or does not raise a genuine issue of material fact sufficient to support a trial.

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). Rule 56(e) requires the nonmoving party to "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts'" showing there exist genuine issues for trial. *Celotex*, 477 U.S. at 324; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). "Tenuous insinuation" and empty speculation based on loose construal of the evidence will not satisfy the non-movant's burden. *Cf. Mesnick v. General Elec. Co.*, 950 F.2d 816, 820 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992).

While the court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in deciding whether to grant or deny a summary judgment motion, FED. R. CIV. P. 56(c), the Rule "saddles the non-movant with the duty to 'designate' the specific facts in the record" supporting its claims. *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id. See also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that

could be made based upon the materials before it on summary judgment."), *cert. denied,* — U.S. —, 116 S.Ct. 74 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson,* 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 919 (11th Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products,* 135 F.3d 1422, 1425 (11th Cir. 1998) (*citing Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989)).

Where there are cross motions for summary judgment, the court must pay careful attention to the substantive evidentiary burdens of the moving parties. For a plaintiff to survive a defendant's motion for summary judgment, she must demonstrate that, to the relevant burden of proof, a reasonable trier of fact *could* find for the plaintiff. A defendant can survive a motion for summary judgment far more easily, as it must only demonstrate that some trier of fact could reasonably find that the plaintiff *could not* meet his burden of proof.

In light of the above, this court must canvass the evidence to determine if there is a genuine issue of material fact.

Facts[1]

Couch was a participant in an employee benefit plan sponsored and maintained by Quorum and adopted by plaintiff's employer, QHC of Gadsden, Inc. ("QHC of Gadsden"), d/b/a Gadsden Regional Medical Center, an affiliate of Quorum. Three documents define the employee benefit plan of which the plaintiff is allegedly a participant. The first is the Quorum Group, Inc. Flexible Benefits Program, which is a cafeteria plan, i.e., a plan that allows employees to purchase among specified health benefits with pre-tax dollars. *See* 26 U.S.C. § 125. One of these plans contained in the cafeteria plan is the Quorum Health Group, Inc. Welfare Benefit Plan ("Welfare Benefit Plan"), the purpose of which is "to provide group medical, dental, life, disability and severance benefits for eligible employees of [Quorum]."

CNA points to the following language of the Welfare Benefit Plan as justifying the application of an arbitrary and capricious standard of review of the denial of the plaintiff's benefits:

> 7.4 *Company and Adminsitrator Decision Final.* The Company and the Administrator have the discretionary authority to determine eligibility for benefits, to interpret the Plan, and to decide claims under the terms of the Plan. The Company may delegate such authority to a claims administrator appointed under Section 3.

Under the Welfare Benefit Plan, "[e]ach employee . . . will be covered, and will be eligible for the benefits provided by the Plan solely in accordance with the terms of the Coverage Schedule applicable to the group or classification of Employees of which such Employee is a member." The Welfare Benefit Plan defines a Coverage Schedule as:

> the benefit plan specifications as set forth in the insurance contracts, administrative services agreement, including any summary plan descriptions of the Plan, or other similar schedules appended to Schedule A and forming a part of

---

[1] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Ins. Co. of Georgia*, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

this Plan, which set forth the groups or classifications of Employees to which such schedule applies, the terms and conditions relating to eligibility for coverage of such Employees . . . , and the levels and types of benefits payable to or on account of such covered Employees. . . .

According to CNA, the Coverage Schedule for the plaintiff, as an employee of QHG of Gadsden is contained in a contract of insurance between Quorum and CNA. The plaintiff apparently disputes this contention, stating that although QHC of Gadsden was included as a participating employer as of 1994, the contract between QHC and Continental Casualty Company was never listed in Schedule A and was not, therefore, the Coverage Schedule governing the plaintiff's long-term disability claims.

Couch, until that point a registered nurse and department director with QHC of Gadsden, filed a claim for long-term disability benefits on October 23, 1995. The basis of her claim was that she suffered from debilitating Meniere's disease, beginning on May 25, 1995. On February 19, 1996, CNA received a copy of the plaintiff's claim for benefits. On February 27, 1996, CNA representative Pam Ward ("Ward") interviewed the plaintiff by phone and sent a letter to the plaintiff requesting supplemental information from her physician Dr. Boyce White. The plaintiff responded by providing copies of Dr. White's medical records of the plaintiff starting on May 29, 1995, all of which document plaintiff's dizziness and problems with Meniere's disease..

CNA informed the plaintiff on March 19, 1996, that the evidence submitted by her was insufficient to support her claim for long-term disability benefits under the plan. On May 13, 1996, the plaintiff submitted the plaintiff's medical records from Dr. White and questionnaire drafted by plaintiff's counsel and filled out by Dr. White. On May 24, 1996, the plaintiff supplemented the documentation provided in her appeal with her medical records from Dr. June Nichols concerning depression resulting from her alleged Meniere's disease. CNA consulted Dr. Charles Paskewicz, a licensed psychologist, on the plaintiff's depression.[2] He issued a memorandum on October 9, 1996 noting that "there is documented evidence of a depression

---

[2] CNA claims that Dr. Paskewicz is an independent contractor who is contacted by CNA to occasionally review medical records to determine the viability of the claim. For obvious reasons, CNA stresses Dr. Paskewicz's independence from it. The plaintiff, by contrast, points out that, as he receives numerous cases for review from CNA, Dr. Paskawicz has an inherent interest in finding for CNA and, as such, his findings should not be given much credence.

whose severity . . . was unreported by the psychologist. . . . ," but that the depression seemed to be responding somewhat to medication.

The next day, October 10, 1996, CNA denied long-term benefits to the plaintiff, essentially because Dr. White allegedly had not, within the period of medical records provided the defendant by the plaintiff, tested the plaintiff to be certain that she suffered from Meniere's disease and because the plaintiff had ceased to report to Dr. Nichols for her depression after September 20, 1995. The plaintiff again appealed and again the defendant denied benefits, providing the same reasons for the denial of benefits as those given before. Prior to this denial of benefits, CNA again sought outside help, this time employing the aid of an internist, who found that "no objective evidence exists that there is a physical problem causing dizziness," and basing that opinion on the lack of evidence in the record of prior testing, such as an electronystagmogram ("ENG") or imaging of the head, that might rule out the existence of Meniere's disease.

The plaintiff appealed the decision of CNA a third time on August 13, 1997, and this time affixed to the appeal a copy of an affidavit indicating that the Social Security Administration had approved disability benefits for the plaintiff. The appeal was denied on August 19, 1997. The plaintiff provided the defendant with further records of treatment by Dr. White including evidence that she had been given an ENG and had been given other scans of her head, controverting the rationale of the internist and CNA's appeals committee officer who had stated lack of testing as a reason for the denial of benefits.

## Contentions & Analysis

The plaintiff and defendant in the instant suit essentially dispute two matters: (1) the appropriate standard of review governing the denial of benefits in the instant case and (2) whether a reasonable trier of fact could not find that the plaintiff was entitled to benefits under the appropriate standard of review.

In *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1449-50 (11th Cir. 1997), the Eleventh Circuit Court of Appeals explained the concept of "standard of review" as it is applied

to a challenged denial of benefits under ERISA:

> ERISA does not provide a standard to review decisions of a plan administrator. In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 [] (1989), the Supreme Court looked to the principles underlying trust law as largely defining the role and responsibilities of a plan fiduciary or administrator; more specifically, the Court reasoned that, "where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion." *Id.* at 111, [](internal citation and quotation marks omitted). Applying these principles, the Court established a range of standards that pertain to benefits determinations under ERISA:
>> a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.... Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion.
>
> *Firestone*, 489 U.S. at 115 [] (citations and quotation marks omitted).
> Consistent with the Court's directive in Firestone, we have adopted three standards of review for plan interpretations: (1) de novo, applicable where the plan administrator is not afforded discretion, (2) arbitrary and capricious when the plan grants the administrator discretion, and (3) heightened arbitrary and capricious where there is a conflict of interest. *Buckley v. Metropolitan Life*, 115 F.3d 936, 939 (11th Cir.), *rehearing denied*, 129 F.3d 617 (11th Cir. 1997) (*citing Marecek v. BellSouth Services, Inc.*, 49 F.3d 702, 705 (11th Cir. 1995)).

Footnotes omitted. The defendant concedes that it has a conflict of interest and that, as such, at a minimum, the appropriate standard of review of CNA's denial of benefits is at least a heightened arbitrary and capricious standard. The plaintiff asserts that the appropriate standard of review is *de novo*. The court will assume that the appropriate standard is the heightened arbitrary and capricious standard, as, even under that standard, no reasonable trier of fact could find that the plaintiff was not entitled to long-term benefits under the plan.

> In accordance with . . . common law principles, we hold that when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest. That is, a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries. This rule, we note, is an extension of the settled federal common law rule developed under the Labor Management Relations Act and subsequently applied in another context under ERISA. *See, e.g., Marshall v. Snyder*, 572 F.2d 894, 900-01 (2d Cir. 1978); *Nedd v. United Mine*

*Workers*, 556 F.2d 190, 210-11 (3ᵈ Cir. 1977), *cert. denied*, 434 U.S. 1013 (1978); *Kaszuk v. Bakery & Confectionery Union*, 638 F.Supp. 365, 373 (N.D.Ill. 1985); *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 636 (W.D.Wis. 1979).

*Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1566-67 (11th Cir. 1990). In determining whether the defendant's denial of benefits was arbitrary and capricious under the heightened standard, the court must "first conduct a *de novo* review to decide if the determination was wrong." *Godfrey v. BellSouth Telecommunications, Inc.*, 89 F.3d 755, 758 (11th Cir. 1996). If the decision of the defendant was wrong, the court next must determine whether the decision was reasonable and, if so, whether it advances the conflicting self-interest of the defendant. *See Id*; *Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1551 (11th Cir. 1994).

The court first finds that CNA's interpretation of and application of its plan was wrong. Under its plan, an applicant is totally disabled and entitled to benefits if, "because of injury or sickness," the employee is:

(1) continuously unable to perform the substantial and material duties of his regular occupation;

(2) under the regular care of a licensed physician other than himself; and

(3) not gainfully employed in any occupation for which he is or becomes qualified by education, training, or experience.

CNA Policy for Quorum Health Group, Inc., at 3. Neither party disputes that the plaintiff is under the care of a licensed physician (requirement 2) or that she is not gainfully employed (requirement 3). They do dispute whether the plaintiff is "continuously unable to perform the substantial and material duties of his regular occupation." The plaintiff does not argue that the defendant's interpretation of this provision is incorrect; rather, she claims that the defendant's application of this provision is simply wrong.

The defendant does not contest, as it did in numerous early stages of review, that the plaintiff does, in fact, suffer from Meniere's disease. Rather, the defendant asserts now, as its sole basis for finding that the plaintiff was able to perform the duties of her job, that the reason for the denial of long-term benefits is because "there is no indication that there was a physical change in [the plaintiff's] long-standing condition that would now render her incapable of performing her job duties." However, no reasonable trier of fact could find other than that

CNA's conclusion is a result of a gross distortion and misreading of the evidence put before it by the plaintiff. Misreading Dr. Nichol's rationale for the plaintiff's leaving work and using that misreading to justify its position that nothing has changed with regard to the plaintiff's Meriere's disease to keep her from acting in her position, CNA states that "[t]he claimant admitted . . . that she was taking a leave of absence due to not being able to think straight and worried that she might make a mistake that would be harmful to one of the patients." CNA asserts this as though it is merely some mental difficulty of the plaintiff, unrelated to her progressing Meniere's disease. It is, however, clear from the context of Dr. Nichol's notes that the basis for her problems is the vertigo associated with the disease.

The defendant, in denying benefits states that it fails to see how the plaintiff's Meniere's disease limited her ability to perform her "light-duty" work. However, in CNA's records relating to the plaintiff's job duties, it is repeatedly stated that fifty percent of the plaintiff's employment consisted of patient care. CNA, in its third denial of benefits, takes for granted the assessment of Dr. White that the plaintiff is restricted from any activity requiring alertness; yet it comes to the conclusion that the plaintiff can perform the full functions of her job, including the care of patients, without being alert. This idea — that an individual who cannot remain alert can somehow treat ill patients — is not simply mistaken, it is absurd. Finally, the court notes that the plaintiff was adjudged disabled by the Social Security Administration, a decision which involved a determination, actually or presumptively, not merely that the plaintiff was disabled from her past work, but from virtually any other work in the national economy.

The court will assume that CNA's position for denying plaintiff benefits, while clearly wrong, was reasonable. As a conflicted fiduaciary, however, CNA must demonstrate more than that its decision was reasonable, it also bears the burden of showing that "its interpretation of the plan was not tainted by self-interest." *Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d at 1551. The defendant has offered no evidence that its decision was not tainted by self-interest. The court will, therefore, GRANT the plaintiff's motion for partial summary judgment and DENY the defendant's motion for summary judgment with regard to this issue.

The defendant, in its brief in support of its motion for summary judgment, also argues the issue of the appropriate amount of damages to be awarded in the event the Court concludes that

Ms. Couch is entitled to long-term disability benefits. Defendant's Brief in Support, page 19-20. The Court notes that this specific argument on the issue of damages does not appear in Defendant's motion for summary judgment, although the Court will address it. In her application for benefits, the plaintiff lists her yearly salary at the time she left work to have been $47,505.12, or $3958.76 per month.[3] Under the plan, the plaintiff is entitled to the lesser of $10,000 per month or sixty percent of her monthly salary, that is, $2375.26. This amount is to be reduced by any social security benefit award for the period during which she is entitled to benefits under the plan. The plaintiff's social security benefits award came in two parts: (1) a lump sum award of $20,391.00, which compensated the plaintiff with benefits dating from November 1, 1995, the same date on which the plaintiff was entitled to long-term disability benefits, and (2) a monthly benefit of $906.00.[4] Thus, the plaintiff's monthly indemnity for long-term benefits is $2375.26 times forty-two (the number of months the plaintiff has been entitled to, but has not received, benefits),[5] or $99,760.75, minus her lump-sum social security benefit award, $20,391.00, and the sum of monthly benefits paid from October of 1997, $906 times nineteen, $17,214.00, or, in total, $37,605.00. Thus, the plaintiff is entitled to an award of $62,155.75, exclusive of pre-judgment interest. The defendant's assertion that the plaintiff is merely entitled to a total of $29,245.02, exclusive of prejudgment interest, is, by this court's estimation, woefully incorrect and would not be upheld by this Court.

## Conclusion

For the foregoing reasons the plaintiff's motion for partial summary judgment will be GRANTED. The defendant's motion for summary judgment will be DENIED.

---

[3] The plaintiff attempts to increase her monthly salary through admission of an external deposition indicating her income. However, to the extent possible, the court is only to review the materials provided to the defendant.

[4] The plaintiff was entitled to that amount in monthly benefits from December of 1996.

[5] The court is concluding the entire month of April in its calculation.

DONE and ORDERED this 21st day of April, 1999.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE